**In re Anderson CARTER, Debtor.**

**Bankruptcy No. 11–95–14093ML.**

United States Bankruptcy Court,
D. New Mexico.

May 6, 1998.

Jennie Deden Behles, P. Diane Webb, Albuquerque, NM, for Debtor.

William Keleher, Kevin Riedel, Albuquerque, NM, for Western Commerce Bank of Carlsbad, Inc.

## MEMORANDUM OPINION

MARK B. McFEELEY, Chief Judge.

THIS MATTER is before the Court on Creditor Western Commerce Bank of Carlsbad's (WCB) Motion for Directed Verdict. The only issue before the Court is whether WCB is entitled to collect interest and attorney fees from the solvent Debtor on its unsecured claim. Having considered the briefs submitted by counsel, reviewed the pleadings and the applicable law, having had a hearing on the merits, and being otherwise fully informed and advised, the Court finds: 1) that the appropriate rate of interest to be applied to WCB's claim is the contract rate of interest consisting of the New York Prime rate plus one percent (1%) calculated through December 5, 1996, and 2) WCB is entitled to attorney fees for the reasonable fees incurred in establishing the validity and amount of the claim, to the extent there is a

surplus remaining in the estate after payment of interest.

### FACTS AND SUMMARY OF PROCEEDINGS

In 1989, a loan was made for a business line of credit to High Country Pecans, Inc., an Arizona Corporation, which filed its own bankruptcy in the District of Arizona. This loan was evidenced by a promissory note in the amount of $600,000. The Debtor signed a personal guarantee of the collateralized loan to High Country Pecans. The loan was a variable interest rate loan with the interest rate being the published New York Prime rate plus one percent (1%). The personal guarantee constituted an unsecured debt.

Subsequently, WCB sought to collect on the Debtor's personal guarantee and instituted a civil lawsuit in the Fifth Judicial District Court.[1] On December 13, 1995, the New Mexico District Court entered a summary judgment against the Debtor in the amount of $630,967.75 bearing interest at the rate of the published New York Prime plus one percent (1%) until paid in full. After WCB attempted to collect on this judgment, the Debtor filed for relief under Chapter 11.

In 1994, the Debtor sought and obtained from WCB a second business line of credit. This loan was made to the Debtor personally and was evidenced by a promissory note in the amount of $225,000 with a variable rate of interest consisting of the published New York Prime plus one percent (1%). The actual amount advanced to the Debtor against this line of credit was approximately $120,000. This debt was also unsecured.

WCB's claim as of the date of the bankruptcy petition was $757,956.83, which included both the amount of the judgment received by WCB against the Debtor on the personal guarantee, and the $120,000 actually advanced to the Debtor against the second line of credit, with accrued interest.

WCB is owned by Western Commerce Bancshares of Carlsbad, Inc. (WCB, Inc). The Debtor owned approximately 3,855

---

1. *Western Commerce Bank v. Anderson Carter*, No. CV–95–118–S, Fifth Judicial District Court, County of Eddy, State of New Mexico.

shares of stock in WCB, Inc. On December 12, 1995, the Debtor filed a Chapter 11 Plan of Reorganization (Plan). In the Plan the Debtor proposed to satisfy WCB's claim with the stock the Debtor owned in WCB, Inc. First, the Plan called for a valuation of the stock held by the Debtor in WCB, Inc. by the Bankruptcy Court. Once the value was established by the Court, the Debtor would then pledge a sufficient amount of that stock as collateral against WCB's claim. WCB's claim would then be satisfied by either 1) the liquidation of the stock and the proceeds therefrom, 2) the transfer of a sufficient amount of the stock back to WCB or 3) the proceeds, if any, of the Debtor's pending lawsuit against WCB, Inc.[2]

In accordance with the terms of the Plan, on June 26, 1996, the Debtor filed a Motion for Valuation seeking to have the Court value the Debtor's stock in WCB, Inc. In that motion, the Debtor asked the Court to base the value of the stock either on the latest appraised value of the stock or on the valuation formula contained in Buy–Sell Agreements between the Debtor and WCB, Inc.[3] According to the Amended Disclosure Statement, these values were $287.59 per share and $272.68 per share, respectively.

WCB objected to the Motion for Valuation on several grounds, including that banking regulations prohibited WCB from accepting the stock in satisfaction of the debt, that the "alleged" Buy–Sell Agreements were invalid, and that the proposed values or formulas to arrive at a value were inappropriate for various reasons.

As a result of the objection to the Motion for Valuation, and the inability of the parties to reach a compromise as to the value of the stock, the motion was set for trial. Discovery in this matter was extensive, and as a result the final hearing on the matter was continued several times due to the extension of discovery deadlines. In March 1997, the Debtor filed a Motion for Partial Summary Judgment and asked the Court to find that the value of the stock was $280.00 as the Debtor had previously offered the bank, based on a letter and deposition testimony of a bank officer. That motion was denied. The matter was finally brought before the Court for a three day trial on the merits commencing on April 8, 1997. At the end of the three day trial the Debtor had not finished putting on his case. The trial was continued until June 30, 1997 for another week. The Debtor rested his case regarding valuation at the end of that week. The Court then strongly encouraged counsel to meet and attempt to reach some sort of compromise on the valuation issue, saying that he was sure counsel would not be happy with the Court "tell[ing] you which one of these [buy-sell] agreements you're bound by and what it says and how it operates."[4]

The trial was set to recommence for another week starting September 2, 1997. On August 29, WCB filed a Motion for Directed Verdict. The Debtor opposed the motion on a number of grounds. The day the trial was scheduled to commence, the parties were able to reach a compromise on several issues. The compromise provided that the objections of WCB to the valuation of the Debtor's stock in WCB, Inc. and to the Debtor's Plan would be withdrawn and WCB would agree to a value for the Debtor's shares of WCB, Inc., of $280.00 per share (value effective December 31, 1996).[5] In addition, WCB also agreed to take an amount of Debtor's personally owned shares in WCB, Inc., sufficient to pay WCB's claim against Debtor including any interest ordered to be paid by the Court through the date of return of that stock and any attorney's fees which may be ordered by the Court to be paid to WCB.

The issues left for this Court to decide are: 1) the rate of interest that should be used to

---

2. The existence of purported Buy–Sell Agreements and the formulas contained therein are the subjects of a lawsuit in the Third Judicial District Court, County of Dona Ana, State of New Mexico, captioned, *Anderson Carter, et.al. v. Western Commerce Bancshares of Carlsbad, Inc., et.al.,* Cause No. CV–95–722 filed on August 18, 1995.

3. *See* Note 2, *supra.*

4. See trial transcript Vol. VI, page 1229, line 19–23.

5. The terms of the compromise are outlined in the Order Confirming Debtor's Third Amended Plan of Reorganization filed October 1, 1997.

calculate the amount of interest, if any, which should be paid on WCB's unsecured claim, and 2) what amount, if any, of WCB's attorney fees can be recovered from the Debtor.

## DISCUSSION

The parties agree and it has never been disputed that the Debtor's estate is and always has been solvent, and that a surplus will remain after all creditors are paid.

### I. INTEREST

■ Generally, where a debtor is insolvent, unsecured creditors in a Chapter 11 proceeding are not entitled to payment of post-petition interest on their claims. *See Nicholas v. United States,* 384 U.S. 678, 684, 86 S.Ct. 1674, 1679–80, 16 L.Ed.2d 853 (1966) ("the accumulation of interest on a debt must be suspended once an enterprise enters a period of bankruptcy administration beyond that in which the underlying interest-bearing obligation was incurred."). There are two notable exceptions to this general rule: 1) oversecured creditors receive post-petition interest on their claims; 2) post-petition interest on unsecured claims is payable in Chapter 7 cases where the bankruptcy estate is solvent. *In re David Green Property Management,* 164 B.R. 92, 96 (Bankr. W.D.Mo.1994).

Chapter 7 allows for the payment of post-petition interest on unsecured claims when the estate produces a surplus after all other claims are paid, but before the Debtor receives any property. As provided by Section 726(a)(5) of the Code:

... property of the estate shall be distributed—

(5) fifth, in payment of interest *at the legal rate* from the date of the filing of the petition, on any claim paid under paragraph (1),(2),(3), or (4) of this subsection; and

(6) sixth, to the debtor.

11 U.S.C. § 726(a)(5)(6) (1998) (emphasis added).

While Chapter 7 expressly provides for payment of interest on unsecured claims in the event the bankruptcy estate produces a surplus, Chapter 11 does not provide for the same treatment of unsecured claims. *See In re David Green Property Management, supra* at 96. However, it seems that an underlying policy of the Code, as evidenced by Section 726, is that a debtor should not receive a windfall at the expense of creditors in the event that there is a surplus after payment of claims. *See In re Gaines,* 178 B.R. 101, 103 (Bankr.W.D.Va.1995); *In re San Joaquin Estates, Inc.,* 64 B.R. 534 (9th Cir. BAP 1986). As one court has stated:

If solvent debtors are to be allowed to receive the Code's benefits, then they must pay *all* of their obligations before retaining any property. Otherwise, solvent debtors would have the option of filing a Chapter 11 petition and extinguishing a creditor's right to interest from the petition date through the date they are fully paid the allowed amount of the claim. In the meantime, the debtors would have the full use of their surplus property... at the expense of creditors. This outcome would clearly not obtain in Chapter 7 and, absent a specific provision in the confirmed plan denying post-petition interest, should not prevail in Chapter 11.

*In re Gaines,* 178 B.R. at 104(emphasis added).

■ Case law also provides that payment of post-petition interest on unsecured claims in a Chapter 11 setting is a matter within the Court's discretion and depends on the equities of the case.[6] These cases provide that post-petition interest is allowable on unsecured claims in Chapter 11 cases where the estate is solvent and a surplus remains after payment of the principal balances of all claims.[7] In fact, it has been found by at least one court to be an abuse of discretion not to

---

6. *See In re Gaines,* 178 B.R. at 103; *In re San Joaquin Estates, Inc.,* 64 B.R. 534 at 536; *In re Shaffer Furniture Co.,* 68 B.R. 827 (Bankr. E.D.Pa.1987); *In re Manville Forest Products Corp.,* 43 B.R. 293, 299–300 (Bankr.S.D.N.Y. 1984); *Matter of Walsh Construction, Inc.,* 669 F.2d 1325, 1330 (9th Cir.1982).

7. *See In re David Green Property Management, supra; In re San Joaquin Estates, Inc., supra; In re Continental Airlines Corp.,* 110 B.R. 276 (Bankr.S.D.Tex.1989).

award post-petition interest in a Chapter 11 case where there is a "very solvent debtor." *In re San Joaquin Estates, Inc., supra* at 536.

■ In the present case, the parties agree there is a solvent estate, and that funds will remain in the estate after all creditors are paid. In this Court's opinion, under these circumstances, unsecured creditors in Chapter 11 are entitled to interest on their claims before any surplus is returned to the Debtor.

The Debtor and WCB disagree as to the rate of interest that should accrue on WCB's claim. WCB argues that it is entitled to the contract rate of interest provided in the agreements entered into between the Debtor and WCB, which rate was also upheld in the state court judgment entered against the Debtor. WCB insists that it would be inherently inequitable for the Court to "go behind" the bargained for rate of interest as that would, in effect, produce a windfall for the Debtor in that he would have the benefit of a lower rate of interest than for which he originally contracted. Furthermore, WCB asserts that the overwhelming majority of case law provides that the contract rate of interest is the rate that is generally applied.

The Debtor argues that the rate of interest should be the federal judgment rate of interest as provided by 28 U.S.C. § 1961 [8], or a risk-free rate of interest like the interest rate on treasury bills, rather than the contract rate of interest. The Debtor argues that federal statutes, not state statutes, determine the legal rate of interest to be paid to creditors when there is surplus after payment of claims under a confirmed Chapter 11 plan. In addition, because the Debtor always had ample stock in WCB with which to pay all of his debt to WCB, there was never any risk to WCB that it would not collect on its claim, and as such the Debtor argues that the interest rate should be the same as that for risk-free investments.

The Court recognizes that there is a split in authority in the meaning of the term "legal rate of interest" as provided by § 726(a)(5). There are currently two approaches, which have been commonly referred to as the "state law approach" and the "federal judgment rate approach".[9] The majority of cases follow the state law approach by providing that when a creditor seeks interest on his or her claim, the bankruptcy courts apply the security agreement's interest rate.[10]

As authority for its position, the Debtor cites to several cases in which the courts

8. 28 U.S.C. § 1961 states, in pertinent part:
(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor my be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment. The Director of the Administrative Office of the Untied States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

9. *See Beguelin v. Volcano Vision, Inc. (In re Beguelin)*, 220 B.R. 94, 99–100 (9th Cir. BAP 1998).

10. *See Matter of Terry Ltd. Partnership*, 27 F.3d 241 (7th Cir.1994); *In re Anderson*, 69 B.R. 105 (9th Cir. BAP 1986); *Sanson Investment Co v. 268 Limited (In Matter of 268 Limited )*, 789 F.2d 674, 676 (9th Cir.1986); *In Re Johnson*, 184 B.R. 570 (Bankr.D.Minn.1995); *In re Schoeneberg*, 156 B.R. 963 (Bankr.W.D.Tex.1993); *In re Consolidated Properties Limited Partnership*, 152 B.R. 452 (Bankr.D.Md.1993); *In Re Hollstrom*, 133 B.R. 535 (Bankr.D.Colo.1991); *In re DWS Investments, Inc.*, 121 B.R. 845 (Bankr.C.D.Cal.1990). *See also* 4 King et al., *Collier on Bankruptcy*, ¶ 506.04[2][b], at 506–113 (15th ed. rev.1997) ("The great majority of the courts to have considered the issue since [the] *Ron Pair* [decision] have concluded that postpetition interest should be computed at the rate provided in the agreement or law under which the claim arosethe so-called 'contract rate' of interest.").

One court put it best when it stated:
The weight of historical case law nationally, . . is that post petition interest is payable either at the contract rate, at the statutory rate (if a specialized statute establishes a specialized rate of interest for a particular creditor) or, if there is no applicable statute and no rate was contracted for, at the state judgment rate.
*In re Schoeneberg*, 156 B.R. 963, 972 (Bankr.W.D.Tex.1993).

came to the conclusion that when a creditor is entitled to interest, the federal judgement rate of interest should be awarded to the unsecured creditor. However, after close analysis, most of these cases are distinguishable from the case at bar.[11]

Recently, the federal judgment rate approach has gained momentum. The Bankruptcy Appellate Panel for the Ninth Circuit outlined rather succinctly the current state of the law in *Beguelin v. Volcano Vision, Inc. (In re Beguelin)*, 220 B.R. 94, 99 (9th Cir. BAP 1998):

> Under the state law approach, if a contract exists between the debtor and creditor that establishes an interest rate on the outstanding balance, the contract rate is the "legal rate." *In re Schoeneberg*, 156 B.R. 963, 972 (Bankr.W.D.Tex.1993). Alternatively, if a specific state statute exists that establishes a rate of interest for a creditor, the statutory rate is the "legal rate." *In re Shaffer Furniture Co.*, 68 B.R. 827, 831 (Bankr.E.D.Pa.1987). Under the federal judgment rate approach, the "legal rate" is established by 28 U.S.C. § 1961. *See In re Godsey*, 134 B.R. 865, 867 (Bankr. M.D.Tenn.1991).

(footnotes omitted).

In *Beguelin*, the lower court had determined that the legal rate was the rate to which a creditor would be entitled if no bankruptcy petition had been filed, and concluded that because property rights are determined by state law, the appropriate rate of interest to be allowed was the rate provided under state law. *Beguelin* at 99. The Bankruptcy Appellate Panel for the Ninth Circuit disagreed with this reasoning, and held that the

federal rate of interest is the more appropriate rate. *Beguelin* at 101. In overruling the lower court's decision, the court was persuaded by the reasoning of *In re Godsey*, 134 B.R. 865 (Bankr.M.D.Tenn.1991) and *In re Melenyzer*, 143 B.R. 829 (Bankr.W.D.Tex. 1992). After analyzing those cases, the court decided that the federal judgment rate is the appropriate measure of interest under § 726(a)(5). The court found particularly significant the convenience and predictability of a pro rata distribution which results from the application of the federal judgment rate. As stated by the court:

> Use of the federal judgment rate for all creditors in a case provides bankruptcy trustees with an efficient and inexpensive means of calculating the amount of interest to be to [sic] paid to each creditor. It is not hard to imagine the administrative nightmare that bankruptcy trustees would otherwise face if they were required to calculate a different interest rate, based on a different source of interest rate, for each creditor.... The burden of requiring a trustee to apply different rates of interest according to the rate provided under contract is a compelling reason not to have to rely on various state legal interest rates. The logistical difficulties and expense involved in doing so would be particularly burdensome in those cases that involve a large number of creditors from multiple jurisdictions.

*Beguelin* at 101.

■ It appears to this Court that, in reaching its conclusion, the *Beguelin* court may have overlooked the underlying policy of

---

11. *See In re David Green Property Management*, 164 B.R. 92, 99 (Bankr.W.D.Mo.1994) (parties "stipulated" that the federal legal rate of interest should apply); *In re San Joaquin Estates, Inc.*, 64 B.R. 534, 536 (9th Cir. BAP 1986)(Chapter 7 post-petition interest paid at the "legal rate"); *In re Oaks Partners, Ltd.*, 135 B.R. 440 (Bankr.N.D.Ga.1991)(discussing interest rates that apply in cram-down situation). The Court also finds distinguishable the authorities relied upon by the court in *Beguelin v. Volcano Vision, Inc. (In re Beguelin)*, 220 B.R. 94 (9th Cir. BAP 1998). *See In re Godsey*, 134 B.R. 865 (Bankr. M.D.Tenn.1991) (court finding federal judgment

rate should be applied in case where personal injury suit was settled during pendency of bankruptcy proceedings); *In re Melenyzer*, 143 B.R. 829 (Bankr.W.D.Tex.1992)(finding that the legal rate was the federal judgment rate where Trustee had surplus of only $12,000 which was not enough to pay the unsecured creditors interest in full at either the federal judgment or contract interest rates.) Furthermore, one authority relied upon by the Debtor had been overruled, with the appellate court finding that the contract rate, not the federal rate, controlled. *In re Laymon*, 117 B.R. 856 (Bankr.W.D.Tex.1990) *rev'd in banc* 958 F.2d 72 (5th Cir.1992).

the Code to avoid producing a windfall for the debtor. As noted earlier, the Code provides that if there is a surplus produced by the estate after all claims are paid, then interest should be paid out on those claims before any surplus is returned to the debtor. Under the facts of this case, if the Court were to modify the originally contracted for interest rate as suggested in *Beguelin*, it would result in a windfall to the Debtor in that property would be returned to the Debtor at WCB's expense. To that end, this Court holds that in situations such as the one at bar, if the solvent estate produces a sufficient surplus from which to pay interest in full to all claimants at the rates prescribed any underlying agreements, contracts or judgments, then that is the interest rate that should be applied by the Court. We do not have to determine what interest rate should be applied when there is not a sufficient surplus to pay interest in full at contract rates to all claimants. It seems, however, in that situation, the reasoning contained in *Beguelin* might be applicable. *See also In re Melenyzer*, 143 B.R. 829 (Bankr.W.D.Tex. 1992).

In this case, the rate of interest contained in the note between WCB and the Debtor and on the note for which the Debtor executed the personal guarantee was one percent (1%) over New York Prime. In addition, the state court judgment obtained by WCB provided that interest was to accumulate at the rate of one percent (1%) over the New York Prime. Therefore, the Court finds that the Bank is entitled to collect interest at the rate of one percent (1%) over New York Prime on its unsecured claim.

■ As stated previously, the award of post-petition interest is a matter within the Court's discretion, dependant upon the equities in the case. The Court feels that to award interest to WCB through the date that the stock is returned to WCB would be, in essence, a windfall to WCB. In the Court's estimation, much of time used in this matter to conduct discovery, as well as the time spent in court, did not benefit either party. Once the disclosure statement was approved, confirmation of the plan valuing the stock at the price proposed by the Debtor, and *finally*

agreed to by WCB, should have ended the matter. Therefore, the Court directs that interest at the rate of the New York Prime plus one percent (1%) be awarded to WCB through the date of the originally scheduled confirmation hearing—December 5, 1996.

## II. ATTORNEY FEES

We turn to the issue of whether WCB may collect the attorney fees it incurred during the bankruptcy proceedings. To reiterate, the Debtor's estate is solvent with a surplus remaining after all claims are paid, and the debt owed to WCB is an unsecured debt.

Again, the Code does not provide for the payment of attorneys' fees to an unsecured creditor when the debtor is solvent. Section 506(b) provides:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b).

Thus, Section 506(b) provides that recovery of fees is available to oversecured creditors. While in this case, for purposes of the Plan, WCB is treated like a secured creditor, the fact remains that the underlying debt that serves as the basis of WCB's claim is unsecured. Therefore, while 506(b) may provide the Court with guidance, it does not directly apply to the facts in this case.

There is very little case law on the issue of whether an unsecured creditor may collect attorney fees from a solvent estate. One case that did address the issue found the situation analogous to whether an unsecured creditor can collect post-petition interest when there is a surplus produced by the bankruptcy estate after all claims are paid. *In re Continental Airlines Corp.*, 110 B.R. 276 (Bankr.S.D.Tex.1989). That court found:

> Nevertheless, at least as an issue of policy, as in the case of interest, creditors should be entitled to the recovery of attorney fees in instances where the Debtor is solvent

and they would be entitled to attorney fees under state law for litigation *over the validity and amount of their claim* but for the filing of the bankruptcy case.... This Court finds no logical reason to prohibit the allowance of attorney's fees for professional *services rendered in successfully establishing a disputed unsecured claim* when the debtor is solvent.

*In re Continental Airlines Corp.*, 110 B.R. 276 at 280 (emphasis added).

■ The Court finds the reasoning contained in *Continental* persuasive. This Court has already found that interest is appropriately awarded to an unsecured creditor when there is a solvent debtor and there is a surplus produced by the estate. The same is true regarding attorneys fees. Using the payment priority contained in Section 506 as guidance, if, after interest is paid to the unsecured creditors, a surplus remains, attorneys fees may be awardable to the unsecured creditors. However, the Court believes that there are several requirements that must be satisfied before any attorney fees can be awarded to unsecured creditors. These requirements are similar to those placed on oversecured creditors when they seek recovery of attorneys fees from a solvent estate.

First, before any attorney fees can be recovered by any unsecured creditor, there must be a surplus remaining in the estate after interest is paid out to the unsecured creditors.

Second, Section 506(b) entitles an oversecured creditor to recover reasonable attorney's fees only if the recovery is expressly provided for in the security agreement. *In re Williams*, 183 B.R. 895, 897 (D.Kan.1995). In this case, the note signed by the Debtor for the line of credit contained the following language:

I agree to apply all costs of collection, ... if I am default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorneys' fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

In addition, the language contained in the personal guarantee contained the following language:

The undersigned agree, jointly and severally, to pay, in addition to the indebtedness hereby guaranteed, reasonable costs of collection hereunder including attorneys' fees.

Therefore, under both agreements, the collection of attorney fees is expressly provided for.

Third, even though the fees may be allowed under the agreement, Section 506 requires an ex post facto reasonableness determination by the bankruptcy court. As stated by one court, "[r]easonableness and enforceability are not, however, conterminous. A concededly unreasonable fee provision might be enforceable under state law, whereas a reasonable one might be unenforceable for reasons unrelated to the size of the fee." *Joseph F. Sanson Investment Co v. 268 Limited (In Matter of 268 Limited)*, 789 F.2d 674, 676 (9th Cir.1986).

Finally, not only must the fees be reasonable, but this Court believes that there is a further limitation placed upon unsecured creditors attempting to recover attorney fees from a solvent estate. As stated by the court in *Continental*, only the attorney fees incurred in the pursuit of establishing the *validity and amount of the unsecured claim* can be paid out of any remaining surplus. *In re Continental Airlines Corp.*, 110 B.R. 276 at 280.[12] Therefore, despite the fact that the

12. The court stated:

Nevertheless, at least as an issue of policy, as in the case of interest, creditors should be entitled to the recovery of attorney fees in instances where the Debtor is solvent and they should be entitled to attorney fees under state law for litigation over the validity and amount

of their claim but for the filing of the bankruptcy case.

This Court would make a distinction where services are rendered on behalf of a creditor in the monitoring of the case as opposed to services rendered in connection with the contest over the claim itself. Otherwise, in every solvent debtor case there would be a tendency for

agreement may provide for attorney fees, only to the extent that those fees were incurred in pursuit of the determination of a disputed unsecured claim, its validity and/or amount, and to the extent that those fees are determined by the court to be reasonable, can the unsecured creditor recover attorney fees from any remaining surplus produced by the solvent estate.

In the present case, the overwhelming majority of the fees incurred by WCB were incurred through the discovery and trial with regard to the motion for valuation of the bank stock. The Court does not believe that WCB's objection to the valuation of the bank stock in any way assisted WCB in establishing either the validity or extent of its claim against the Debtor. To the contrary, WCB's claim was never objected to or disputed by the Debtor in any way, except as to the amount of interest and attorney fees that could be collected. There was never any question that the Bank's claim was valid or that it would be paid, the only question throughout these proceedings being the amount and type of property that would be used to satisfy WCB's claim.

■ The Court finds disconcerting WCB's apparent disregard of the economics in this case. The fact that attorney fees are provided for in an underlying agreement does not give a creditor the wholesale right to incur enormous attorney fees in order to garner a better position in a bankruptcy. It is inequitable in this Court's estimation to assess costs to the Debtor for WCB's attempt to extort from the Debtor a better deal than to which they were entitled.

■ The Court finds that there is insufficient evidence before the Court to determine the total amount of attorney fees that were expended in establishing the validity and amount of WCB's claim. If, after interest is paid out on all the unsecured claims, a surplus remains from which attorneys fees can be paid, and counsel cannot reach an agreement as to the total amount of the fees incurred, WCB may file an amended motion

all claimants to have attorneys present at all hearings, since the cost would be passed on to the Debtor. That would be intolerable and would tend to defeat the purposes of the Code.

and request a hearing so that the Court may determine the amount of attorney fees that can be recovered by WCB. The Court also finds that to the extent that WCB incurred attorney fees in establishing their claim in the bankruptcy proceedings in Arizona, those fees are recoverable before funds or property are returned to the Debtor.

### CONCLUSION

For the foregoing reasons, the Court finds that the proper rate of interest to be applied to WCB's claim is the contract rate of interest (the published New York Prime rate plus one percent (1%)), with the interest calculated through December 5, 1996. Additionally, the Court awards attorney fees to WCB to the extent that they were incurred in establishing the validity and amount of their claim, in an amount to be agreed upon by counsel or determined after proper application to the Court.

This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. Counsel for the Debtor is directed to prepare an order in conformance herewith, have same approved by counsel for WCB within ten (10) days.

*In re Continental Airlines Corp.*, 110 B.R. 276, 280 (Bankr.S.D.Tex.1989).